UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ROBERT ELI FULLER,

    Plaintiff,

v.

R. NDOH, Warden,

    Defendant.

Case No. 17-cv-03196-YGR (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; AND DENYING CERTIFICATE OF APPEALABILITY**

Petitioner Robert Eli Fuller, a state prisoner currently incarcerated at Avenal State Prison, brings the instant *pro se* habeas action under 28 U.S.C. § 2254 to challenge his 2013 conviction and 2014 sentence rendered in the Santa Clara County Superior Court, stemming from a "road rage" incident in which he punched the victim. The jury found Petitioner guilty of battery causing serious bodily injury and assault by means of force likely to produce great bodily injury. Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby DENIES the petition for the reasons set forth below.

## I. BACKGROUND

### A. Factual Background

The California Court of Appeal summarized the facts relating to Petitioner's offense as follows. This summary is presumed correct. *See Hernandez v. Small*, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

> A. *Facts of the Offense*
>
> 1. *Testimony of José Muñoz Robles*
>
> José Muñoz Robles, the victim, testified as follows. As a traffic enforcement officer, Robles was accustomed to dealing with disgruntled and aggressive motorists. In doing so, he always tried to defuse tense encounters by remaining calm, maintaining a friendly demeanor, and using an appropriate tone of voice.
>
> On June 22, 2013, Robles was driving his 1994 Honda Prelude with his girlfriend, Nicole Isaac, in the passenger's seat. At approximately 4:47 p.m., they were waiting at a traffic light at the intersection of Brokaw Road and Coleman Avenue in the city of Santa Clara. Robles was in the right lane of Brokaw Road, waiting

to turn right onto southbound Coleman Avenue. The light was red, and the traffic on Coleman Avenue was too heavy to make a right turn safely.

While waiting to turn, Robles heard a loud, persistent honking from a silver SUV behind him. The driver of the SUV was making erratic hand motions. Robles inferred the driver wanted him to move forward, but Robles remained stationary because it was still unsafe to turn. Robles testified that at that point, "the driver made a maneuver which made me maneuver." The silver SUV swerved into the left turn lane, which made Robles think the driver was attempting to go around him. So Robles "maneuvered a little to the left" to indicate that he (Robles) would move. The silver SUV then pulled up beside Robles on the left and stopped.

Defendant got out of the driver's side of the silver SUV. He walked around the front of the SUV and approached Robles' car. Defendant was walking in a determined manner, as if to say, "I'm going to do something." He was gesturing with his hands, pushing them towards himself as if to say, "Here, here." Robles did not want to put his girlfriend or his property in danger, so he stepped out of his vehicle in an attempt to defuse the situation. Using "a military tactic" designed to scare defendant away, Robles said, "What are you going to do," and placed his left fist into his right hand with a smacking sound. Defendant kept coming towards him. Robles took one or two steps forward and said something like: "Okay. Do you want to play?"

At that point, defendant struck Robles. Robles, who was knocked unconscious, could not recall how many times defendant hit him. He could not remember seeing defendant's hands coming toward him. He found himself lying on the ground, trying to wake up. His girlfriend was pulling him out from under the front left side of the car and trying to pick him up. Defendant was gone. Robles never fought back against defendant, and never swung his fists towards him. Robles did not have anything in his hands, and he did not have a weapon.

Robles was diagnosed with a concussion, and he was unable to close his jaw for some time. He had a cut on his lower lip, and his arm was bleeding.

### 2. *Testimony of Ann Blair*

Ann Blair was in a car on Brokaw Road behind the silver SUV at the time of the incident. The light at the intersection was red, and she was waiting behind the other cars to make a right turn onto Coleman Avenue. The cross traffic on Coleman Avenue was "pretty heavy" at the time.

Blair then heard honking from the SUV in front of her. The cross traffic on Coleman Avenue had stopped, and the cars in her lane were free to make the right turn. The cars in the left turn lane were moving forward to turn left. However, the car in front of the SUV was "kind of stopped or going slowly." At that point, the SUV turned into the left lane to go around the car, but the car immediately

2

turned a few feet to the left, cutting off the SUV. Both vehicles stopped, and Blair thought, "This doesn't look good." The two cars were parked in a V-shaped, wedge formation, with the SUV's right headlight next to the car's left front tire.

Blair then saw defendant get out of the SUV and walk around to the front of the vehicle. Defendant appeared very angry, with a set jaw, and a stern, forceful demeanor. Robles appeared surprised and stepped part way out of his car. Robles was gesturing with his hands while standing in between the open door and the frame of the car. At that point, Blair looked down to find her phone in an attempt to take a photograph. When she looked back up, Robles had closed his car door and had walked forward. Looking through the windshield of the SUV, Blair saw the defendant drawing his arm back with his hand balled into a fist. She could not see Robles' head. She saw defendant's fist "go back again, and then it went forward." At that point, she could not see Robles' body; he was on the ground with the soles of his shoes facing upwards. Blair then realized Robles had been struck.

Blair wrote down the SUV's license plate number on a piece of paper while the SUV fled from the scene. Robles was lying on the ground "out cold" with a bloody face. Blair called 911.

### 3. *Testimony of Other Witnesses*

*Mary Issac*—Mary Isaac, Robles' girlfriend, was sitting in the passenger seat of Robles's Honda during the incident. Robles was waiting for the red light when they heard honking from a silver SUV behind them. After a few moments, the SUV pulled up to the left side of the Honda. Robles pulled to the left, and the SUV stopped. The driver of the SUV then took off his seatbelt and rushed out of his car. Robles got out while the driver of the SUV approached him. The driver of the SUV was mad and aggravated, raising his fist as he approached Robles. Isaac then saw Robles falling onto the hood of the Honda. She did not see the driver of the SUV making contact with Robles because the frame of the car blocked her view.

*Santa Rangel*—Santa Rangel was in her car at the intersection waiting to turn left onto Coleman Avenue. She saw two vehicles that appeared to be involved in a collision. The driver of a silver SUV quickly got out of his vehicle and started yelling at the person in the other car. The driver of the car got out and started yelling back. The driver of the SUV then punched the driver of the car twice in the face. The driver of the car fell to the ground and lay there as if he was unconscious. The driver of the SUV got back in his vehicle and fled.

*Richard Torres*—Richard Torres and his girlfriend were in a car on Coleman Avenue waiting at a red light at the intersection with Brokaw Road. The vehicles on Brokaw Road had a green light, but "there was a commotion going on." Torres saw defendant stepping out of a silver SUV in an erratic fashion. Robles was getting out of his car with this hands up as if to say, "my bad." Defendant

3

> punched Robles once in the jaw, whereupon defendant[1] fell onto the pavement. Defendant got back into his SUV and sped off. Torres got a good look at the SUV's license plate and wrote it down on a piece of paper to give to the police.
>
> *Officer Luke Erickson*—Santa Clara Police Officer Luke Erickson arrived at the intersection shortly after 4:38 p.m. Robles had a swollen, bleeding lower lip, and he appeared to be confused or in shock. Officer Erickson requested medical personnel, and Robles was transported to the hospital. Ann Blair, a witness, gave Officer Erickson a piece of paper with the license plate number of the SUV. Police determined the vehicle belonged to defendant. They found him and his vehicle at his residence several hours later. Defendant had a small laceration on the knuckles of his left hand consistent with striking someone or something. Police took defendant into custody.

*People v. Fuller*, No. H041280, 2016 WL 2756435, *1-3 (Cal. Ct. App. May 9, 2016).

### B. Procedural History

#### 1. Conviction and Sentencing

On September 19, 2013, the prosecution charged Petitioner in a two count information with battery causing serious bodily injury (Count 1) and assault by means of force likely to produce great bodily injury (Count 2). 1CT 57-58. As to both counts, the information alleged Petitioner personally inflicted great bodily injury upon the victim. 1CT 58. The information further alleged that Petitioner had four prior strike convictions within the meaning of California Penal Code §§ 667(b)-(i) and 1170.12. 1CT 64. It also alleged that he had four prior convictions within the meaning of California Penal Code § 667(a). 1CT 65

At the beginning of trial, Petitioner admitted the prior conviction allegations. 1CT 182. At trial, Petitioner put forth a theory of self-defense. *Fuller*, 2016 WL 2756435, *1. On December 12, 2013, the jury convicted Petitioner on both counts and found the enhancements to be true as to both counts. 2CT 241-245.

At sentencing on July 18, 2014, the trial court granted Petitioner's *Romero*[2] motion and struck three of his four prior strike convictions. 2CT 340; *Fuller*, 2016 WL 2756435, *3. The trial court sentenced Petitioner to a total term of 21 years, including enhancements. 2CT 338-341.

---

[1] This Court notes that the state appellate court opinion contains a typographical error as Torres testified that *Robles* fell, not defendant. 4RT 411.

[2] *People v. Romero*, 13 Cal. 4th 531 (1996).

4

### 2. Post-Conviction Appeals and Collateral Attacks

On direct appeal, the California Court of Appeal affirmed the judgment in an unpublished opinion issued on May 9, 2016. *Fuller*, 2016 WL 2756435, *5; Resp't Ex. 6. Petitioner had raised one claim of instructional error, contending that "the trial court erred by instructing the jury on the limited availability of the right to self-defense when a defendant engages in mutual combat." *Fuller*, 2016 WL 2756435, *1. The state appellate court concluded the trial court properly instructed the jury based on the evidence adduced at trial. *Id.* at *1, 3-5.

On July 13, 2016, the California Supreme Court denied review. Resp't Ex. 8.

### 3. Federal Court Proceedings

On June 5, 2017, Petitioner filed the instant federal petition, in which he raises the same aforementioned claim of instructional error. Dkt. 1. On June 21, 2017, Magistrate Nandor J. Vadas issued an Order to Show Cause. Dkt. 7. Thereafter, this case was reassigned to the undersigned judge. Dkt. 10. Respondent has filed an Answer. Dkt. 12. Petitioner has filed a Traverse. Dkt. 13. The matter is now fully briefed.

## II. LEGAL STANDARD

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *see Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, s*ee Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, and thus falls under the

first clause of section 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of section 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *See Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000). Moreover, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Even if constitutional error is established, habeas relief is warranted only if the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Penry v. Johnson*, 532 U.S. 782, 795-96 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)).

On federal habeas review, AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). In applying the above standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004). The last reasoned decision as to Petitioner's claim of instructional error is the California Court of Appeal's unpublished disposition issued on May 9, 2016. *Fuller*, 2016 WL 2756435, *5; Resp't Ex. 6.

## III. LEGAL CLAIM

### A. Background

As mentioned above, at trial, Petitioner presented a theory of self-defense. *Fuller*, 2016 WL 2756435, *1. The trial court gave the following CALCRIM instructions on the battery and assault charges as well as the defenses in this case:

> 925. BATTERY CAUSING SERIOUS BODILY INJURY (Pen. Code, §§ 242, 243(d))
>
> The defendant is charged in Count 1 with battery causing serious bodily injury in violation of Penal Code section 243(d).
>
> To prove the defendant is guilty of this charge, the People must prove:
>
> 1. The defendant willfully and unlawfully touched Jose Munoz Robles in a harmful or offensive manner;
>
> 2. Jose Munoz Robles suffered serious bodily injury as a result of the force used, and
>
> 3. The defendant did not act in self-defense.

2CT 216.

> 875. ASSAULT WITH FORCE LIKELY TO PRODUCE GREAT BODILY INJURY (Pen. Code, §§ 240, 245(a)(1)–(3), (b))
>
> The defendant is charged in Count 2 with assault with force likely to produce great bodily injury in violation of Penal Code section 245.
>
> To prove the defendant is guilty of this crime, the People must prove:
>
> 1A. The defendant did an act that by its nature would directly and probably result in the application of force to a person, and
>
> 1B. The force used was likely to produce great bodily injury;
>
> 2. The defendant did that act willfully;
>
> 3. When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone;
>
> 4. When the defendant acted, he had the present ability to apply force (likely to produce great bodily injury); and
>
> 5. The defendant did not act in self-defense.

2CT 218.

3470. RIGHT TO SELF-DEFENSE OR DEFENSE OF ANOTHER

Self-defense is a defense to Counts 1, 2, and the lesser uncharged crimes. The defendant is not guilty of those crimes if he used force against the other person in lawful self-defense. The defendant acted in lawful self-defense if:

1. The defendant reasonably believed that he was in imminent danger of suffering bodily injury;

2. The defendant reasonably believed that the immediate use of force was necessary to defend against that danger;

and

3. The defendant used no more force than was reasonably necessary to defend against that danger.

Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of bodily injury to himself. Defendant's belief must have been reasonable and he must have acted because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the defendant did not act in lawful self-defense.

When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

The slightest touching can be unlawful if it is done in a rude or angry way. Making contact with another person, including through his or her clothing, is enough. The touching does not have to cause pain or injury of any kind.

The defendant's belief that he was threatened may be reasonable even if he relied on information that was not true. However, the defendant must actually and reasonably have believed that the information was true.

A defendant is not required to retreat. He or she is entitled to stand his or her ground and defend himself, [and] if reasonably necessary, to pursue an assailant until the danger of death or bodily injury has passed. This is so even if safety could have been achieved by retreating.

The People have the burden of proving beyond a reasonable doubt that the defendant did not act in lawful self-defense. If the People have not met this burden, you must find the defendant not guilty of the crimes.

2CT 224-225.

8

3471. RIGHT TO SELF-DEFENSE: MUTUAL COMBAT OR INITIAL AGGRESSOR

A person who engages in mutual combat or who starts a fight has a right to self-defense only if:

1. He actually and in good faith tried to stop fighting;

and

2. He indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting;

and

3. He gave his opponent a chance to stop fighting.

If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight.

A fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose.

2CT 226.

Deputy District Attorney Teresa McLaughlin wanted the trial court to instruct the jury with CALCRIM No. 3471 (the mutual combat instruction), Paul Puri, Esq. (Petitioner's trial counsel) objected to it, and the trial court summarized their arguments for and against the instruction as follows:

> CALCRIM 3471, mutual combat. The defense initially said there is no mutual combat here. Therefore, this instruction might not be applicable. Mr. Puri said this is not a duel and this instruction reads to a duel situation. The Court gave examples of sometimes it's not an exact duel and it's not two people throwing blows at the same time, but this goes to whether there was an agreement by the parties to engage in some kind of a fight. And the instruction clearly says it's something that can be stablished by conduct rather than by words. For example, two people jumping out of a car at the same time during a dispute in a traffic lane. The district attorney said that she wanted this instruction because it contains the element of what is reasonable, which she and the defense are going to be arguing to the jury, and they should be instructed on that. And in the end Mr. Puri said I think even though this is not classic duel, mutual combat, this is something the jury should be instructed on. So that will be given.

4RT 438-439. Attorney Puri further stated as follows:

> . . . [O]ur position is that the evidence strongly supports that Mr. Fuller was standing at the front of his car and then Mr. Robles got

9

out of his car after the mutuality or simultaneity I think is not present in the record so much. It's pretty weak. And so I would like the record to reflect that we objected to mutual combat, and the Court, after hearing the People's argument, decided to include the instruction over our objection.

4RT 440. The trial court responded:

> Very good. Part of that discussion was I understand the defense theory of the case is there was no mutual combat. But they are put on the horns of a dilemma because they can't argue that Mr. Fuller acted in self-defense unless they agree that the alleged victim engaged in some conduct that caused Mr. Fuller to believe that there was a fight. And so I suppose they could argue that the alleged victim did all the actions and that Mr. Fuller just gave one blow to defend against the conduct, but in the end the jury has to decide whether it's mutual combat or not.

4RT 440-441. Attorney Puri disagreed with the trial court, and he argued that the self-defense instruction was "sufficient to tell the jury whether [his] client had a right to defend himself at that very moment, whether he was in—at that moment in a reasonable fear of his—of being hit by the other person." 4RT 441. Attorney Puri again stressed that there was no evidence of mutual combat because the testimony from all witnesses, with the possible exception of Richard Torres, placed Petitioner at the front of his car when Mr. Robles got out of his vehicle. 4RT 441. The following is the final transcript of the discussion during which the trial court found the evidence supported the mutual combat instruction:

> THE COURT: I understand your theory of the case. I understand why you advocate this position. And it's good you do, but in the end there is enough evidence for the jurors to consider whether it is mutual combat. And if the jury is not instructed on mutual combat, then it's error by the Court. And the instruction says what is mutual combat. If the jurors find it's not mutual combat, then that instruction doesn't apply.
>
> Also, I have already told the jurors just because I give an instruction doesn't mean I am making a finding as to the facts.[3]
>
> For you two to argue, I don't think—you two may not even argue mutual combat.

---

[3] The record shows that the trial court specifically instructed the jury as follows:
> Some of these instructions may not apply, depending on your findings about the facts of the case. Do not assume because I am giving a particular instruction, that I'm suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them.

2CT 198.

          MS. McLAUGHLIN: As I stated before, the outline of the instruction shows mutual combat or initial aggressor. I think there is an argument to be made with regards to who was the initial aggressor.

          MR. PURI: We are both saying the other one is the initial aggressor.

          THE COURT: So it's best to give this instruction, from the Court's perspective, because if you guys are going to argue it, you should tell the jurors what the law is in the absence of that.

4RT 441-442 (footnote added).

**B.    State Court Opinion**

In a reasoned opinion, the state appellate court summarized Petitioner's claim and affirmed the aforementioned ruling of the trial court, stating as follows:

> Defendant contends the trial court erred by instructing the jury on mutual combat because there was no evidence that the parties had any prearranged agreement to fight. The Attorney General concedes the parties had no express agreement to fight, but she responds that the jury could have inferred an implicit agreement based on the parties' conduct. We agree with the Attorney General.
>
> After the two men stopped their vehicles, defendant exited his vehicle in an aggressive manner. He appeared angry and aggravated. Witnesses testified that defendant was yelling at Robles or gesturing with his hands so as to invite a physical encounter. Robles, by his own admission, got out of his car, punched his left fist into the palm of his right hand, and responded, "Do you want to play?" The jury reasonably could have inferred from this conduct that the parties simultaneously and implicitly agreed to fight each other. The evidence thereby supported the trial court's instruction.
>
> Furthermore, the court instructed the jury that the doctrine applies in the disjunctive to "[a] person who engages in mutual combat or who starts a fight . . . ." The prosecution presented evidence that defendant initiated the fight. Defendant concedes that substantial evidence supported the latter part of this rule, applying the doctrine to the initial aggressor. Furthermore, the trial court instructed the jury that "these instructions may not apply depending on your findings about the facts of the case . . . ."
>
> In the absence of any indication to the contrary, we assume the jury properly followed these instructions. Accordingly, if the jury did not find sufficient evidence of mutual combat, it would not have applied the challenged instruction to defendant's detriment unless it also concluded he was the initial aggressor.

> Defendant's reliance on *Ross*[4] is misplaced. There, the trial court instructed the jury on mutual combat based on CALJIC No. 5.56. (*Ross*, *supra*, 155 Cal. App. 4th at p. 1042, fn. 9.) At the time, the instruction contained no definition of the phrase "mutual combat." In deliberations, the jury asked the trial court to provide a legal definition of that phrase. The court declined to provide any definition and instructed the jury to rely on the "common, everyday meaning of those words or that phrase." (*Id.* at p. 1043.) This court held the trial court erred because the legal meaning of mutual combat requires a preexisting intent by the parties to engage in it. We found it likely that the jury convicted defendant based on a mistaken understanding of mutual combat and, accordingly, we reversed the conviction. Here, by contrast, the trial court properly instructed the jury that "[a] fight is mutual combat when it began or continued by mutual consent or agreement," which consent or agreement "must occur before the claim to self-defense arose." Under the holding of *Ross*, this is a proper statement of the doctrine. Thus, there is no reasonable probability the jury misapplied the instruction. We therefore conclude defendant's appeal is without merit.

*Fuller*, 2016 WL 2756435, *4-5 (footnote added).

### C. Applicable Law

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. *See Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'"). The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. *See Estelle*, 502 U.S. at 72. The inquiry is not how reasonable jurors could or would have understood the instruction as a whole; rather, the court must inquire whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution. *Id.* at 72 & n.4. In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. *United States v. Frady*, 456 U.S. 152, 169 (1982) (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)).

---

[4] *People v. Ross*, 155 Cal. App. 4th 1033 (2007).

12

### D. Analysis

Here, Petitioner does not argue that CALCRIM No. 3471 (mutual combat or initial aggressor) was an incorrect statement of the law. Rather, he argues that the evidence did not support providing CALCRIM No. 3471 to the jury. Whether evidence is sufficient to support a jury instruction is not a federal constitutional question. *Cf. Griffin v. United States*, 502 U.S. 46, 56-57, 60 (1991) ("if the evidence is insufficient to support an alternative legal theory of liability, it would generally be preferable for the court to give an instruction removing that theory from the jury's consideration. The refusal to do so, however, does not provide an independent basis for reversing an otherwise valid conviction."); *People v. Guiton*, 4 Cal. 4th 1116, 1129-30 (1993) (recognizing that it is a state law error to give a jury instruction that is legally correct, but unsupported by evidence in the record). The trial court's decision to give CALCRIM No. 3471 was not contrary to or an unreasonable application of U.S. Supreme Court precedent, and did not involve an unreasonable determination of the facts.

In addition, viewing the instructions as a whole, it is clear that the challenged instructions did not "so infect[] the entire trial that the resulting conviction violate[d] due process." *Estelle*, 502 U.S. at 72. That is, Petitioner has not demonstrated that there is a "reasonable likelihood" that the jury misapplied the instructions. *Id.* Petitioner's argument is based on the application of his own version of the facts, and fails to take into consideration evidence that the prosecution set forth, which the jury credited. The jury instructions, as given by the trial court, also included CALCRIM No. 224 on self-defense; CALCRIM No. 3472 on limiting the right to use force in self-defense "if he or she provokes a fight or quarrel with the intent to create an excuse to use force"; and CALCRIM No. 200 which informs the jurors that some of the instructions might not apply, and that they should only follow the instructions that do apply. 2CT 198, 224, 227.

Even assuming that CALCRIM No. 3471 was not supported by the evidence presented at trial, the trial court's decision to give the challenged instructions did not deprive Petitioner of his right to a fair trial. CALCRIM No. 3471 does not preclude the jury from finding that Petitioner acted in self-defense. Rather, CALCRIM No. 3471 stated only that under specified circumstances, Petitioner could not legitimately claim self-defense. If, as Petitioner believes, the evidence did not

13

1 fit those specified circumstances, then the jury could have disregarded the challenged instruction, as they were so directed in CALCRIM No. 200. As explained above, CALCRIM No. 200 instructed the jury to follow only the instructions that applied to the facts of the case. 2CT 198, *see supra* fn. 3.

After a review of the relevant record, the Court concludes that the trial court instructing the jury with CALCRIM No. 3471 in the context of this case did not violate Petitioner's federal constitutional rights. Under the facts presented here, CALCRIM No. 3471 did not so infect the trial with unfairness as to deny due process of law. As the state appellate court determined, the facts fairly supported providing CALCRIM No. 3471 to the jury. *See Fuller*, 2016 WL 2756435, *4-5. Ample evidence existed from which the jury reasonably could have inferred based on the parties' conduct that they "simultaneously and implicitly agreed to fight each other." *Id.*

Alternatively, even assuming that providing CALCRIM No. 3471 violated the U.S. Constitution, given Petitioner's actions, any error could not have had a "substantial and injurious effect or influence" in determining the jury's verdict in this case. *See Brecht*, 507 U.S. at 637. A review of the record confirms the following facts: the two men stopped their vehicles in the middle of traffic, 3RT 132, 211, 294; Petitioner was the first to exit his vehicle in an "erratic" manner, 3RT 132; Petitioner appeared "angry" and "aggravated," 3RT 216, 265, 295; witnesses testified that Petitioner was yelling at Mr. Robles or gesturing with his hands, 3RT 216, 265-266; Mr. Robles, by his own admission, got out of his car, punched his left fist into the palm of his right hand, and responded, "Do you want to play?" 3RT 134-136, 182-185; witnesses testified that Petitioner was the only one who threw a punch at Mr. Robles, 3RT 219-220, 295, 298; and Mr. Robles was knocked unconscious after being punched, and he suffered a concussion, 3RT 136, 139-141. Given these facts, even if there was instructional error, the error did not have a substantial and injurious effect on the jury. That is, the jury still could have found that Petitioner's use of force was not warranted even after he presented a theory of self-defense.

Accordingly, the state appellate court's rejection of the instructional error claim was not contrary to or an unreasonable application of federal law. Therefore, this claim is DENIED.

## IV. CERTIFICATE OF APPEALABILITY

No certificate of appealability is warranted in this case. For the reasons set out above, jurists of reason would not find this Court's denial of Petitioner's instructional error claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Ninth Circuit under Rule 22 of the Federal Rules of Appellate Procedure. *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

## V. CONCLUSION

For the reasons outlined above, the Court orders as follows:

1. The sole instructional error claim in the petition is DENIED, and a certificate of appealability will not issue. Petitioner may seek a certificate of appealability from the Ninth Circuit Court of Appeals.

2. The Clerk of the Court shall terminate any pending motions and close the file.

IT IS SO ORDERED.

Dated: March 6, 2018

_____
YVONNE GONZALEZ ROGERS
United States District Judge